**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          klynn@bursor.com
          jwilner@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHLINE MEDIA, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION .................................................................................................. 1

THE PARTIES ...................................................................................................................... 4

JURISDICTION AND VENUE ............................................................................................ 4

FACTUAL ALLEGATIONS ................................................................................................ 4

I.    OVERVIEW OF THE CALIFORNIA INVASION OF PRIVACY ACT ..................... 4

II.   DEFENDANT VIOLATES THE CIPA § 638.51 ......................................................... 7

    A.    The Mechanics and Privacy Implications of IP Addresses ...................................... 7

        1.    Differentiating Between Public and Private IP Addresses ........................... 8

        2.    Advertisers Use Public IP Addresses to Target Specific
            Households and Data Brokers Attach IP Addresses to
            Comprehensive User Profiles To Identify An Individual .......................... 11

    B.    The ADNXS Tracker Is A "Pen Register" ............................................................ 14

        1.    The ADNXS Tracker and the Advertising Technology
            Companies It Syncs With on Defendant's Website ................................... 15

            (i)    The ID5 Tracker ............................................................................ 19

            (ii)   The Trade Desk (the Adsvr Tracker) ............................................. 21

III.  DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF
     PLAINTIFF'S AND CLASS MEMBERS' PRIVACY ......................................... 25

    A.    Data Brokers and Real-Time Bidding: The Information Economy ...................... 26

        1.    Data Brokers ............................................................................................. 26

        2.    Real-Time Bidding ................................................................................... 31

        3.    Cookie Syncing ........................................................................................ 36

    B.    Defendant Uses The ADNXS Tracker For Targeted Advertising and
       Data Monetization ................................................................................................ 40

IV.   PLAINTIFF'S EXPERIENCE ................................................................................... 42

CLASS ALLEGATIONS .................................................................................................... 44

CAUSES OF ACTION ....................................................................................................... 46

PRAYER FOR RELIEF ...................................................................................................... 48

JURY DEMAND .................................................................................................................. 48

Plaintiff Monica Rodriguez ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Healthline Media, LLC ("Healthline" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Defendant Healthline owns and operates healthline.com (the "Website").  According to Defendant, the Website is the "#1 health information site in the U.S."[1]

2.     Defendant is responsible for the installation of a tracker (i.e., third-party script) into the code of its Website—namely, the ADNXS Tracker (the "Tracker").  The Tracker is operated by a separate and distinct third party: Microsoft Corporation (the "Third Party" or "Microsoft").

3.     Through the Tracker—as integrated by Defendant—Microsoft records every Website users' internet protocol ("IP") addresses and other device identifier information such as device type, and browser type ("Device Metadata").  The Tracker also sets a cookie that includes a unique user identifier, which the Tracker records on subsequent visits, and which is used by Microsoft to identify and deanonymize the user.

4.     Defendant and Microsoft then use the data collected by the Tracker to deanonymize and identify users and hyper-target users with advertising.

5.     Because the Tracker captures Website visitors' "routing, addressing, or signaling information," the Tracker constitutes a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  Cal. Penal Code § 638.50(b).

6.     By installing and using the Tracker and disclosing Plaintiff's IP address to the Tracker without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

---

[1] HEALTHLINE MEDIA, https://www.healthlinemedia.com/company#:~:text=We're%20Creating%20a%20Stronger,starts%20publishing%20original%20health%20content.

7.    The collection of IP addresses is particularly invasive here given that Defendant also installs on Website users' browsers a tracker from data broker ID5 Technology[2] ("ID5"), and The Trade Desk, among others, and the ADNXS Tracker syncs with them.  These entities connect the information collected from Website users (IP addresses, Device Metadata, unique user IDs) to the massive user profiles they maintain, thus identifying and deanonymizing Website users.  This prevents users from being anonymous when they visit the Website.

8.    Furthermore, at Defendant's direction (and to Defendant's financial benefit), Microsoft, ID5 and The Trade Desk are all participants in the "real-time bidding economy," where they sell the comprehensive user profiles to interested advertisers, and the advertisers are better able to target their advertisements (and will pay more money) based on the increased identifiability of Defendant's users.  All of this enriches Defendant, who monetizes its Website as the beneficiary of that advertising revenue.  This is to the detriment of Website users, whose identities are disclosed and whose information is bought and sold without consent.

9.    Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents as alleged herein, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

10.    This is not the first time Defendant has been sued for violating the rights of Californian consumers related to its handling of sensitive health-related data.  The California Attorney General ("CA AG") sued Defendant on July 1, 2025 for the "company's sharing of personal information and alleged failure to properly implement opt-out mechanisms, resulting in disclosures about activity on the Healthline website to third parties who used it for advertising purposes."[3]  Defendant's settlement of that lawsuit marked the "largest settlement yet" for alleged violations of the California Consumer Privacy Act ("CCPA"),[4] a law separate from CIPA but related to it.

---

[2] DATA BROKER REGISTRATION FOR ID5 TECHNOLOGY, https://oag.ca.gov/data-broker/registration/550584.

[3] *California Attorney General Enters $1.55 Million CCPA Settlement with Healthline Media*, HOLLAND & KNIGHT, (July 3, 2025), https://www.hklaw.com/en/insights/publications/2025/07/california-attorney-general-enters-ccpa-settlement.

[4] *Id.*

11.     In its lawsuit against Defendant, the CA AG outlined the ways that Healthline failed to comply with the CCPA including by "enter[ing] into contracts [with third-party advertising partners plausibly including Microsoft, The Trade Desk, and ID5] that [fail to] meet the [privacy protection] requirements of the CCPA and its implementing regulations."[5]  Under the CCPA, the law requires, among other protections for consumers, that businesses that sell personal information or share it for certain personalized advertising purposes like Defendant must have a written contract with the recipient that lists the "limited and specified purposes" for which the data may be used.  Cal. Civ. Code § 1798.100(d).

12.     After reviewing Defendant's contracts, the CA AG found that several Healthline contracts with third parties did not contain the CCPA-mandated terms.[6]  By sharing consumer personal information without proper CCPA-contractual restrictions, the CA AG found that Healthline allowed third parties to use the data for their own purposes, effectively treating the data sharing as a sale.  As part of the settlement, "[t]o the extent Healthline sells or shares the personal information of consumers, including via online tracking technology, Healthline [was required to provide] notice to consumers …, that clearly states that it sells and shares their personal information, and that consumers have the right to opt-out of all sales or sharing."[7]

13.     Healthline ignores and violates CCPA's requirements and, as relevant here, the requirements of CIPA, because it installed its Tracker (a pen register) and did not obtain prior consent from Plaintiff and Class Members before allowing the Third Party to use it to intercept their communications with Defendant.

---

[5] https://oag.ca.gov/system/files/attachments/press-docs/Proposed%20Order%20re%20Injunction%20with%20case%20number.pdf at ¶ 22(b).

[6] *The People of the State of California v. Healthline Media, LLC*, CGC-25-626794 (July 1, 2025), https://oag.ca.gov/system/files/attachments/press-docs/People%20v.%20Healthline%20Media%20Complaint.pdf at ¶¶ 24-25.

[7] https://oag.ca.gov/system/files/attachments/press-docs/Proposed%20Order%20re%20Injunction%20with%20case%20number.pdf at ¶ 16.

1

**THE PARTIES**

2          14.     Plaintiff Monica Rodriguez resides in California and has the intent to remain there

3    and is therefore a citizen of California.  Plaintiff Rodriguez was in California when she visited the

4    Website and had her information disclosed by Defendant.  At all relevant times, Plaintiff resided in

5    Bakersfield, California.

6          15.     Defendant Healthline Media, LLC is a Delaware corporation with its principal place

7    of business at 660 Third Street, San Francisco, California 94107.

8          **JURISDICTION AND VENUE**

9          16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

10   § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the

11   proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100

12   members of the putative class, and at least one class member is a citizen of a different state than

13   Defendant.

14         17.     This Court has personal jurisdiction over Defendant because Healthline has and

15   continues to conduct business within the State of California and is Headquartered in California.

16         18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's

17   principal place of business is in this District.

18         **FACTUAL ALLEGATIONS**

19   **I.     OVERVIEW OF THE CALIFORNIA INVASION OF PRIVACY ACT**

20         19.     The California Legislature enacted CIPA to protect certain privacy rights of

21   California citizens.  The California Legislature expressly recognized that "the development of new

22   devices and techniques for the purpose of eavesdropping upon private communications … has

23   created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and

24   civilized society."  Cal. Penal Code § 630.

25         20.     As the California Supreme Court has held in explaining the purpose behind the CIPA:

26              While one who imparts private information risks the betrayal of his
                confidence by the other party, a substantial distinction has been
27              recognized between the secondhand repetition of the contents of a
                conversation and its *simultaneous dissemination to an unannounced*
28

*second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements.*

*Ribas v. Clark* 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

21.    As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

22.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

23.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

24.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

25.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that same telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices to Internet technologies.

26.    For example, if a user *sends* an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user *receives* an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

27.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

28.     Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50 specifically to the ADNXS Tracker at issue here.  *See*, *e.g.*, *Echeverria-Corzan v. Fox Corp.*, 2025 WL 3128194 (N.D. Cal. November 7, 2025) (finding the ADNXS Tracker is a pen register within the meaning of CIPA); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *5, *5-6 (N.D. Cal. Oct. 9, 2025) (same); *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-3 (N.D. Cal. Sept. 4, 2025) (finding PubMatic Tracker, which is similar to the ADNXS Tracker used here, is a "pen register" within the meaning of CIPA); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (finding trackers similar to ADNXS here are "pen registers" under the CIPA); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Angeles Cnty. Super. Ct. Sept. 24, 2025) (same); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

29.     This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").

30.    Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.    DEFENDANT VIOLATES THE CIPA § 638.51

31.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored.  In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured in Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



32.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

33.    In addition, the server's instructions cause the Tracker to be installed on a user's browser.  The Tracker then causes the browser to send identifying ("addressing") information to the Third Party.

34.    Microsoft's Tracker will also send a user ID unique to their Tracker that also allows the user to be tracked across the Internet.  And the Third Party syncs their Tracker with those of data brokers to deanonymize and identify users.  All this stems from Defendant's installation and use of the Tracker.

### A.    The Mechanics and Privacy Implications of IP Addresses

35.    An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is

called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses.

36.     While IPv6 adoption has been increasing, many networks still rely on IPv4.[8]

37.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

### 1.     *Differentiating Between Public and Private IP Addresses*

38.     A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally. Public IP addresses are required for devices that need direct internet access.

39.     While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible. If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

40.     Public IP addresses can be used to determine the approximate physical location of a device and therefore the user of that device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

41.     A private IP address is used within an internal network and is not routable on the public internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). Thus, private IP addresses can be used repeatedly across different networks because they are isolated

---

[8]     *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

from the global internet.  For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

42.    The distinction between a public and private IP address is fundamental to the architecture of modern networks.  Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

43.    An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  The public IP address determines the phone number that is making the call, which provides the most identified information.   On the other hand, knowing whether Handset #1 versus Handset #2 is making a call allows one to distinguish between members of the same household, although less can be gleaned from this fact on its own.

44.    The same is true of IP addresses.  The public IP address divulges the approximate location of the user who is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user communicates with the website and the Internet at large.  The private IP address then distinguishes between the devices accessing the Internet from this location point.[9]

---

[9] While the Tracker does not collect private IP addresses, as discussed below, the Tracker also collects Device Metadata that distinguishes between devices accessing the same public IP address. So, by installing the Tracker on the browsers of Website users, Defendant allows the Third Party to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

1

**Figure 2:**

2



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

45.    Thus, the differences between public and private IP addresses are as follows:

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges: 10.0.0.0 – 10.255.255.255, 172.16.0.0 – 172.31.255.255, 192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

46.    A public IP address is therefore "routing, addressing, or signaling information."

---

47.     A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

48.     A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[10]

2.     *Advertisers Use Public IP Addresses to Target Specific Households and Data Brokers Attach IP Addresses to Comprehensive User Profiles To Identify An Individual*

49.     Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address reveals the user's geographical location down to a specific household or potentially a specific individual—which "provide[s] a level of specificity previously unfound in marketing."[11]

50.     A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[12] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[13]

51.     Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[14] because "[c]ompanies can use an IP address … to personally identify individuals."[15]

52.     In fact, a public IP address is a common identifier used for "geomarketing," which is

---

[10] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[11] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[12] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[13] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/4uk2p7k9.

[14] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[15] Trey Titone, *The Future of IP Address as an Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

---

"the practice of using location data to identify and serve marketing messages to a highly targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[16] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[17]

53.     "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[18]

54.     "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[19]

55.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[20] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[21]

56.     Furthermore, "IP address targeting can help businesses to improve their overall marketing strategy."[22] "By analyzing data on which households or businesses are responding to their

---

[16] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[17] *See*, *e.g.*, *Personalize Your Website and Digital Marketing Using IP Address*, GEOFLI, https://tinyurl.com/3vkmjsw2.

[18] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[19] *Id.*

[20] Williams, *supra*.

[21] *Id.*

[22] *Id.*

ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[23]

57.    As mentioned previously, the collection of IP addresses is particularly invasive here given that Defendant also installs on Website users' browsers a tracker from data broker ID5 Technology[24], and The Trade Desk, among others, and the Third Party syncs with them.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[25]

58.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[26]

59.    In other words, not only does the collection of IP addresses by Microsoft cause harm in and of itself, the Third Party specifically attaches IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.  This harm is facilitated and caused by Defendant's installation and use of the Tracker.

---

[23] *Id.*

[24] DATA BROKER REGISTRATION FOR ID5 TECHNOLOGY, https://oag.ca.gov/data-broker/registration/550584.

[25] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[26] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

60.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[27]

61.     Likewise, under the CCPA (which Defendant was sued under by the CA AG as discussed *supra*), IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A).[28]

62.     As alleged below, Defendant installs the Tracker on the user's browser for marketing and analytics purposes, and the Tracker collects information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the ADNXS Tracker is a "pen register."

63.     Thus, any time a user visits the Website, Defendant will cause the Tracker to be installed on users' browsers, and that Tracker will collect the user's IP address and Device Metadata.

**B.      The ADNXS Tracker Is A "Pen Register"**

64.     When companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[29]

65.     Often, third-party scripts are installed on websites "for advertising purposes."[30] Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[31]

---

[27] *Is an IP Address Personal Data?*, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[28] A "consumer" is defined as "a natural person who is a California resident." Cal. Civ. Code § 1798.140(i).) A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services." Cal. Civ. Code § 1798.140(1).)

[29] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[30] *Id.*

[31] *Id.*

66.     Defendant incorporates the ADNXS Tracker's code into the code of its Website, including when Plaintiff and Class Members visited the Website.  As described below, when Plaintiff and Class Members visited the Website, Defendant caused the Tracker to be installed on Plaintiff's and Class Members' browsers.  This allowed the Third Party—through its ADNXS Tracker—to collect Plaintiff's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

67.     The Tracker also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Party, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like UUID, PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion.  Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

68.     Defendant and the Third Party then use the public IP addresses, Device Metadata, and unique identifiers of Website visitors that are collected and set by the Tracker, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements on Plaintiff and Class Members, and unjustly enrich themselves through this improperly collected information.

69.     At no time prior to the installation and use of the Tracker on Plaintiff's and Class Members' browsers, or prior to the use of the Tracker, did Defendant procure Plaintiff's and Class Members' consent for such conduct.  Nor did Defendant obtain a court order to install or use the Tracker.

   1.     *The ADNXS Tracker and the Advertising Technology Companies It Syncs With on Defendant's Website*

70.     Microsoft is a technology company with software-as-a-service products, such as Microsoft Advertising.  Microsoft owns and operates the ADNXS Tracker, which it provides to

website owners like Defendant for a fee.  Microsoft rebranded ADNXS to "Microsoft Invest," but the two are the same service.

71.    In 2022, when Microsoft formally acquired AT&T's ad-tech business, Xandr, it provided Microsoft with demand- and sell-side platforms which Xandr operated.[32] Thus, the ADNXS Tracker functions as both a demand-side platform or "DSP" and a sell-side platform or "SSP" and both terms are explained in more detail below.  According to Microsoft, the ADNXS Tracker is "a strategic buying platform built for the needs of today's advertisers looking to invest in upper funnel buying and drive business results."[33]

72.    Microsoft facilities the selling of Defendant's Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity through this Tracker.  This process enables Defendant to monetize its Website.  To achieve this, Microsoft uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

73.    When a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records and decodes—as the below screenshot from Plaintiff's browser indicates (relevant portions highlighted in red boxes):

---

[32] *AT&T Sells Xandr to Microsoft: Microsoft and Xandr have been working together for more than 10 years*, ADWEEK, (Dec. 21, 2021), https://www.adweek.com/programmatic/att-sells-xandr-to microsoft/#:~:text=Microsoft%20and%20Xandr%20have%20been%20working%20together%20fo r%20more%20than%2010%20years&text=AT&T%20launched%20Xandr%2C%20named%20for %20Alexander%20Graham%20Bell%2C%20in%202018.&text=Microsoft%20will%20acquire%2 0AT&T's%20ad,Financial%20details%20weren't%20released.

[33] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest.

1

2



Figure 4:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    74.    Moreover, Microsoft stores a cookie (the unique identifier, "UUID2" after "set

20    cookie" in Figure 4 above) with the user's IP address and Device Metadata in the user's browser

21    cache.  The UUID2 "[r]egisters a unique ID that identifies a returning user's device" that "is used

22    for targeted ads."[34]

23    75.    When the user subsequently visits Defendant's Website, the ADNXS Tracker locates

24    the UUID2 stored on the user's browser.  If UUID2 is stored on the browser, the ADNXS Tracker

25    causes the browser to send the UUID2 along with the user's IP address and Device Metadata to

26    Microsoft.

27

28    _____

[34] *Notice for Cookies and Similar Technologies*, Casio, https://world.casio.com/cookie/.

76.    Using UUID2, IP addresses, and Device Metadata, Microsoft can track and identify Website users on the Website and across the Internet.  A general diagram of this process is pictured as Figure 5, which explains how the Website causes the ADNXS Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the UUID2.

**Figure 5:**



77.    Microsoft also stores a cookie with the user's IP address in the user's browser cache. When the user subsequently visits Defendant's Website, the ADNXS Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the ADNXS Tracker causes the browser to send the cookie along with the user's IP address to Microsoft.  (*See* Figure 1, *supra*).

78.    If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the ADNXS Tracker stores a UUID2 cookie in the browser cache, and (iv) Microsoft will continue to receive the user's IP address, Device Metadata, and UUID2 on subsequent Website visits as part of the cookie transmission.

79.    In all cases, however, Microsoft receives a user's IP address, Device Metadata, and unique UUID2 identifier every time its Tracker is loaded by the Website.

80.     Microsoft is also syncing its unique user identifier with ID5 Technology Ltd., a data broker, as well as The Trade Desk, another DSP, to obtain whatever information those two third parties know about the user (and vice versa) for use in real-time bidding.

**(i)      The ID5 Tracker**

81.     Microsoft and ID5 have openly touted their collaboration.[35]  The ADNXS Tracker syncs with the ID5 Tracker owned by ID5 Technology Ltd., as Figure 6 shows (see text in red box). As pictured in the below screenshot from Plaintiff's browser, the value of the "puid" parameter parameter matches the value of the "uuid2" parameter in Figure 4.  This allows Microsoft to obtain the information ID5 has on the user (and vice versa).  And ID5 sets its own cookies on the user's browser:

**Figure 6:**



82.     Indeed, the "id5-sync.com" value leaves little doubt that Microsoft is matching its cookies with ID5 to obtain any information ID5 has about Plaintiff (and vice versa).  ID5 also enhances the information Microsoft knows about Plaintiff with information that ID5 knows about Plaintiff.  Finally, ID5 enhances this user information by installing its own cookie on Plaintiff's browser for further tracking, syncing, and deanonymization.

83.     In fact, ID5 boasts that its "ID5 ID" "is a next-generation universal identifier that publishers, advertisers and ad tech platforms can use to recognise users and deliver campaign

---

[35] *ID5 Announces Collaboration with Microsoft Advertising to Empower Publishers to Embrace the Cookieless Era,* ID5 (Sept. 19, 2023), https://id5.io/news/id5-microsoft-advertising/.

objectives across different types of devices without relying on traditional identification methods (e.g. third-party cookies and MAIDs)."[36]   It helps website owners like Defendant utilize their first party data by "leveraging a variety of signals such as hashed email addresses, page URL, IP addresses, timestamps etc., as well as a machine learning algorithm" to package up audiences for marketers that will drive ad revenue.[37]   It does this with "IdentityCloud," its comprehensive suite of services.[38]

84.     According to ID5, it "provides an evolving suite of identity solutions for the digital advertising ecosystem" to "enable[e] effective advertising. [Its] technology platform enables publishers and advertisers to more effectively recognize browsers and other devices over time by generating a unique, pseudonymous ID."[39]   This helps website owners like Defendant recognize users and target them for advertisements.

85.     ID5's "Adaptive Identity" technology is "designed to solve identity challenges at scale in a fragmented ecosystem.  At its core is machine learning, which allows [ID5] to move beyond rigid rules and one-size-fits-all approaches.  Instead of relying on static logics, Adaptive Identity continuously learns from behavioural patterns, environments, and outcomes, making identity resolution smarter, more accurate, and more resilient over time."[40]   It can follow website users "across channels, across devices, and across the ecosystem."[41]

86.     The upshot of all this is that ID5 enables website owners like Defendant to effectively sell their user inventory to advertisers in a deanonymized, targeted format.  By syncing its tracker with Microsoft's, ID5 facilitates this goal, leveraging Microsoft's and its own replete database of user profiles to deanonymize and identify Website users.

---

[36] ID5, https://github.com/id5io/id5-api.js/blob/master/README.md; *see also*, *First-party IDs and identity resolution methods explained*, ID5, (March 23, 2022), https://id5.io/news/first-party-ids-and-identity-resolution-methods-explained (ID5 uses "hashed email addresses and IP addresses" to "reconcile users across domains and devices.").

[37] ID5, https://github.com/id5io/id5-api.js/blob/master/README.md.

[38] *ID5 Launches IdentityCloud, the Comprehensive Identity Solution for Digital Advertising*, EXCHANGEWIRE (Oct. 21, 2021), https://www.exchangewire.com/blog/2021/10/21/id5-launches-identitycloud-comprehensive-identity-solution/.

[39] ID5, https://id5.io/platform-privacy-policy/.

[40] ID5, https://id5.io/news/introducing-adaptive-identity-a-smarter-approach-to-addressability-for-a-connected-world.

[41] *Id*.

---

87.     Microsoft, in turn, builds on its already expansive database by learning whatever ID5 knows about the Website user.  And Defendant profits from the interaction because its users can be sold to advertisers for more money, thus enriching Defendant.

**(ii)     The Trade Desk (the Adsvr Tracker)**

88.     Microsoft syncs its Tracker with the Adsrvr tracker, which Defendant also installs on Website users' browsers.  The Adsrvr tracker is owned and operated by The Trade Desk.  Microsoft has openly touted its synchronization with The Trade Desk's identifiers.[42]

89.     As the below screenshot from Plaintiff's browser indicates, the value of the "TDID" parameter matches the value of the "uuid2" parameter in Figure 7 below, meaning Microsoft is syncing its cookies with The Trade Desk to obtain any information The Trade Desk has about the user (and vice versa).  Finally, The Trade Desk is installing its own cookies (the unique identifiers, "TDID" and "TDCPM") on Plaintiff's browser for further tracking, syncing, and deanonymization. Indeed, The Trade Desk notes the TDID is used to "establish[] the correlation between unique identifiers (IDs) for the same user in The Trade Desk platform and your platform,"[43] while the TDCPM identifier "is used to register a unique ID that identifies a returning user's device.  The ID is used for targeted ads."[44]

**Figure 7:**



90.     The Trade Desk is a demand-side platform (explained below) that companies use to "analyze[] up to 15 million ad opportunities each second to help [advertisers] optimize campaigns

---

[42] *Microsoft Monetize - Publisher Guide for Deal Sync with Trade Desk,* MICROSOFT IGNITE, https://learn.microsoft.com/en-us/xandr/monetize/deal-sync-with-trade-desk-publisher-guide.

[43] *Cookie Mapping*, THE TRADE DESK, https://partner.thetradedesk.com/v3/portal/data/doc/CookieSyncing.

[44] *Cookie List*, NOKIA, https://www.nokia.com/cookies/cookie-list/.

in real time with more flexibility and control."[45]  According to The Trade Desk, "[t]hrough its self-service, cloud-based platform, ad buyers can create, manage, and optimize digital advertising campaigns across ad formats and devices."[46]  For website owners like Defendant this means they can potentially benefit from increased demand for their ad inventory.

91.    Like Microsoft's services, The Trade Desk facilitates the selling of Defendant's Website users to interested advertisers.  "Advertisers can use the platform to target specific audiences based on various parameters such as demographics, interests, browsing behavior, and location.  The platform also offers real-time bidding capabilities, allowing advertisers to bid on ad placements in real-time auctions."[47]

92.    Besides its real-time bidding capabilities, The Trade Desk's "Unified ID 2.0 Initiative" facilitates identifying consumers "across the open internet" and helps "create more durable audience segments for targeting and measurement."[48]  "Unified ID 2.0 leverages encrypted email and phone number data to provide a[n allegedly] privacy-conscious, secure, and accurate identity standard for the entire digital advertising ecosystem."[49]

93.    However, the FTC has long warned that "hashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong*."[50]  Indeed, as recently as July of 2024, the FTC stated again that

---

[45] THE TRADE DESK, https://www.thetradedesk.com/our-demand-side-platform.

[46] *The Trade Desk Launches New Media Trading Platform for the Modern Marketer*, THE TRADE DESK (July 7, 2021), https://tinyurl.com/mrej3ch7.

[47] AMPLITUDE, https://amplitude.com/docs/data/destination-catalog/thetradedesk#:~:text=TheTradeDesk%20allows%20advertisers%20to%20access,placements%20in%20real%2Dtime%20auctions.

[48] THE TRADE DESK, https://www.thetradedesk.com/unified-id-solution-2-0.

[49] THE TRADE DESK, https://unifiedid.com/.

[50] Ed Felten, *Does Hashing Make Data "Anonymous"?*, FEDERAL TRADE COMMISSION (Apr. 22, 2012), https://tinyurl.com/yktttwvjn (emphasis added).

"hashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."[51]

94.     Further undermining any anonymity, The Trade Desk maintains all user data in an Identity Alliance, which "is a coalition of the industry's leading identity graph solutions that seamlessly combines all people, households, and devices into a single, unified graph."[52]  This graph is built on the "ingest[ion] of billions of events" and "deterministic identifiers" capitalizing on its "sophisticated machine-learning model that can use the best data available to deliver scale and precision for targeting audiences across devices and channels."[53]

**Figure 8:**



95.     In addition, The Trade Desk's "Koa AI" continually analyzes ad performance data to enhance advertising campaigns by identifying and prioritizing the most valuable ad impressions in real-time.[54]  The Trade Desk boasts that "[its] AI prioritizes and selects the best-performing and most

---

[51] *No, Hashing Still Doesn't Making Your Data Anonymous*, FEDERAL TRADE COMMISSION (July 24, 2024), https://tinyurl.com/y5b7nayk.

[52] *How Identity Graphs Are Built—the Present and the Future*, THE TRADE DESK (Mar. 6, 2024), https://www.thetradedesk.com/resources/how-identity-graphs-are-built-the-present-and-the-future.

[53] *Id.*

[54] THE TRADE DESK, https://www.thetradedesk.com/our-demand-side-platform/ai-artificial-intelligence.

relevant inventory based on a campaign's goals, helping [advertisers] achieve the best price per impression."[55]

96. The Trade Desk's AI capabilities also "analyze existing customer data and build lookalike audiences. This helps brands expand reach by targeting users who share similar behaviors and characteristics with their best-performing customers."[56]

97. The Trade Desk not only has geotargeting capabilities but the platform also "allows radius targeting around specific coordinates and even combines demographic data with geolocation for precision advertising."[57] Moreover, "[t]hrough [its] partnerships with retail media networks, The Trade Desk provides access to transaction-based targeting, allowing brands to reach shoppers based on real purchase data from major retailers."[58]

98. The upshot of all this is that The Trade Desk enables website owners like Defendant to effectively sell their user inventory to advertisers in a deanonymized, targeted format. And by syncing with the ADNXS Tracker, The Trade Desk enhances the already massive amount of information it knows about users with Microsoft's equally massive repository, thus thoroughly deanonymizing and identifying Website users and enriching Defendant in the process.

99. Defendant profits from installing The Trade Desk's tracker on its Website because its Website's users like Plaintiff and the Class Members can be sold to advertisers for more money, thus enriching Defendant.

*        *        *

100. This is a non-exhaustive list of the entities with whom Microsoft syncs its user cookies on Defendant's Website. Suffice it to say, Microsoft is syncing its user cookies with numerous advertising technology companies like ID5 and The Trade Desk (Adsrvr) to collect as much information about a user as possible and deanonymize the user, all of which is used for advertising purposes that enrich the Third Party and Defendant alike.

---

[55] *Id.*

[56] IMPROVADO, https://improvado.io/blog/the-trade-desk-guide.

[57] *Id.*

[58] *Id.*

101.    The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

102.    Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See, e.g.*, *James*, 701 F. Supp. 3d at 958; *Lesh*, 767 F. Supp. 3d at 40 (quoting same).

103.    Because the ADNXS Tracker captures outgoing "routing, addressing, and signaling" information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

104.    The ADNXS Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

## III.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

105.    The collection of Plaintiff's and Class Members' personally identifying deanonymized information through Defendant's installation and use of the Tracker constitutes an invasion of privacy. *See, e.g.*, *Deivaprakash*, 2025 WL 2541952, at *4 n.4.

106.    As alleged herein, the Tracker and the trackers it syncs with are designed to deanonymize and identify Website users by linking various identifiers to comprehensive profiles, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

107.    To put the invasiveness of Defendant's violations of the CIPA into perspective, however, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

108.    The import of these concepts is that: (i) Microsoft syncs with other third parties that are data brokers to uniquely identify and deanonymize Website users by matching users' to their IP addresses, Device Metadata, and unique ID values with comprehensive profiles held by those data

brokers (or the Third Party itself); (ii) Microsoft shares that information with other entities like data brokers to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant, Microsoft, The Trade Desk, and the Data Broker and to the detriment of users' privacy interests.

### A.    Data Brokers and Real-Time Bidding: The Information Economy

#### 1.    Data Brokers

109.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[59] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

110.    Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a), which ID5 Technology[60] does.

111.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a 360 view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers. It helps you understand the journey, such as a purchase journey, in chronological order so you can make recommendations to close a deal. Identity graphs can store profile data and easily connect new consumer identifiers to profiles."[61]  This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law.  An "identity graph provider" is therefore just a euphemism for "data broker."

112.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise

---

[59] SHERMAN, *supra*, at 2.

[60] DATA BROKER REGISTRATION FOR ID5 TECHNOLOGY, https://oag.ca.gov/data-broker/registration/550584.

[61] Graph and AI, AWS, https://aws.amazon.com/neptune/graph-and-ai/.

shar[ing] the data with third parties."[62]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[63]  Thus, data brokers possess information that can identify users by name (in addition to a whole host of other information), and combine that information with information about users' hobbies, interests, and attributes.

113.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled).  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[64]

114.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[65]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[66]

115.    This data collection has grave implications for Americans' right to privacy.    For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and

---

[62] SHERMAN, *supra*, at 2.

[63] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[64] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[65] SHERMAN, *supra*, at 1.

[66] *Id.*

Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[67]

116.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

117.    This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements.

118.    Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

119.    Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[68]

120.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[69]

---

[67] *Id.* at 9.

[68] *Id.*

[69] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

1

**Figure 9:**



121.    In the modern age, these threats are far too real.  For instance, the gunman who assassinated a Minnesota state representative and her husband "may have gotten their addresses or other personal details from online data broker services, according to court documents."[70]

122.    Similarly, following the protests in Los Angeles this past summer:

> Tech-skeptical California lawmakers and activists fear the Trump administration will leverage tech tools to track and punish demonstrators accused of interfering with Immigration and Customs Enforcement raids. One possible instrument at ICE's disposal: location data, a highly detailed record of people's daily movements

---

[70] Lily Hay Newman, *Minnesota Shooting Suspect Allegedly Used Data Broker Sites to Find Targets' Addresses*, WIRED (June 16, 2025), https://www.wired.com/story/minnesota-lawmaker-shootings-people-search-data-brokers/.

that's collected and sold by everything from weather apps to data brokers.[71]

123.    Of course, data brokers do not just track people for no reason; they do so because they have their trackers installed on users' browsers and are paid by website operators to do so.  So, by installing the Data Broker ID5 tracker on users' browsers, Defendant is causing and putting its users in the crosshairs of the privacy harms noted above.

124.    In addition, as noted above, data brokers like ID5 can compile wide swaths of information in part by collecting users' IP addresses and Device Metadata, which is used by data brokers to track users across the Internet.[72]

125.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[73]

126.    Thus, by collecting IP addresses and Device Metadata, data brokers like ID5 can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.  But ultimately, this is a process that Defendant facilities and benefits from.

127.    As a result of Defendant's installation of the tracker of Data Broker ID5 on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked

---

[71] Tyler Katzenberger, *LA Protests Fuel California Drive To Hide Data From Trump*, POLITICO (June 11, 2025), https://www.politico.com/news/2025/06/11/la-protests-california-hide-data-trump-00400127

[72] *Id.* at 11.

[73] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

to any profiles ID5 may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members).

128.    These profiles are then served up to companies that want to advertise on Defendant's Website, and Defendant's users become more valuable because of having their IP addresses and Device Metadata linked to ID5's data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the tracker of the Data Broker on Plaintiff's and Class Members' browsers, thus enabling Plaintiff and Class Members to be identified and deanonymized by correlating their IP addresses and Device Metadata to comprehensive profiles.  But the flipside of Defendant's installation and use of these trackers is causing the extensive proliferation and dissemination of Website users' information and exposing said users to real and significant harm.

### 2.    Real-Time Bidding

129.    Once a data broker like ID5 collects Website users' information and creates or links that information to its comprehensive user profiles, how does the data broker "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

130.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[74]

131.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs).  SSPs [like Microsoft's Tracker[75]] primarily work with website or app publishers to help them participate in the RTB process.  DSPs [like the ADNXS Tracker[76] and The Trade Desk Tracker[77]] primarily work with

---

[74] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[75] Lynne Kjolso, *Microsoft Advertising brings inventory in-house through Monetize SSP*, MICROSOFT (Mar. 6, 2023), https://about.ads.microsoft.com/en/blog/post/march-2023/microsoft-advertising-brings-inventory-in-house-through-monetize-ssp.

[76] *Microsoft Invest*, MICROSOFT, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[77] *The Trade Desk*, MARKETING+MEDIA ALLIANCE, https://mmaglobal.com/sponsors/trade-desk#:~:text=The%20Trade%20Desk%20powers%20the,and%20performance%20for%20clients%

advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[78]    And an Advertising Exchange—which Microsoft provides[79]—"allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[80]

132.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

133.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

134.    Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[81]

---

20worldwide ("The Trade Desk has become the fastest growing demand-side platform in the industry.")

[78] Geoghegan, *supra*.

[79] Microsoft Ignite, *Microsoft Monetize - Microsoft advertising exchange inventory* (Nov. 17-21, 2025), https://learn.microsoft.com/en-us/xandr/monetize/microsoft-advertising-exchange-inventory.

[80] Geoghegan, *supra*.

[81] Geoghegan, *supra*; see also REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

**Figure 10:**



135.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.  These entities receive assistance because Defendant also installs the tracker of data brokers (like Data Broker ID5) on its users' browsers, and these trackers sync with each other to obtain complete user profiles:

> the economic incentives of an auction mean that a DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road.  The DSP [or SSP] enlists a final actor, the data management platform (DMP) [or data brokers/identity graph provider].  DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers … thus enabling easier linkage of the data to the user's profile in the future.[82]

---

[82] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022), https://tinyurl.com/yjddt5ey; *see also* PERION, *What Is A Supply-Side Platform (SSP): Definition and Importance*, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

---

**Figure 11:**



136.    In other words, an SSP can solicit the highest bids for Website users by identifying and deanonymizing those users by combining the information Microsoft knows about that user with the information ID5, and many other data brokers know about that user. If there is a match, then Microsoft will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

137.    Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers by providing those advertisers with as much information about users as possible, which it does by syncing with Microsoft—who in turn, syncs with the Data Broker.

138.    Thus, Defendant's installation and use of the Third-Party Tracker, The Trade Desk Tracker and ID5 Tracker is deliberate and intended by Defendant to enrich itself through the unconsented-to sale of its users' information through the real-time bidding process.

139.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory— particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)    "send[ing] sensitive data across geographic borders."

(c)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[83]

140.    Given Microsoft operates as a DSP here, the last point is particularly relevant, as it means Microsoft—through the ADNXS Tracker—collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

141.    The Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[84]

142.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[85]:

---

[83] *Unpacking Real Time Bidding Through FTC's Case on Mobilewalla*, FEDERAL TRADE COMMISSION (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[84] Geoghegan, *supra*.

[85] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

**Figure 12:**



143.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law, and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."); *Deivaprakash*, 2025 WL 2541952, at *4 (finding injury where data "collection allegedly allowed the third parties to: (1) build a profile reflecting [plaintiff's] personal information; and (2) interfere with [plaintiff's] ability to remain anonymous.").

       *3.    Cookie Syncing*

144.    It should now be clear both the capabilities of the Third Party (*i.e.*, a DSP and advertising exchange that syncs with data brokers who deanonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs and uses the ADNXS Tracker on its Website (to sell to advertisers in real-time bidding with as much information about users as

possible to solicit the highest bids). The final question is how does the Third Party share information with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

145.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[86] This allows entities like the Third Party to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[87]

146.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find

---

[86] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[87] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

---

out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[88]

**Figure 13:**



147.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[89]

148.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[90]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place

---

[88] Papadopoulos, *supra*, at 1433.

[89] Papadopoulos, *supra*, at 1434.

[90] *Id.*

and sync a new set of userIDs, and eventually reconstruct a new browsing history."[91]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[92]

149.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[93]

150.    Cookie syncing is precisely what is happening here.  As mentioned earlier, when the ADNXS Tracker is installed on Website users' browsers, it syncs its cookies with other third parties on the Website (*e.g.*, the Data Broker and The Trade Desk).  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

*        *        *

151.    To summarize the proceeding allegations, Microsoft, and the advertising technology companies it syncs with (ID5, a Data Broker, and The Trade Desk, a DSP), facilitate the collection and use of user data for targeted advertising and those pieces of information are connected to information Microsoft gleans from other sources (*e.g.*, various data brokers) to build comprehensive profiles.  Microsoft may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information it gleans from other sources (*e.g.*, various data brokers) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared between Microsoft and with other entities to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interested advertisers through real-time bidding using Microsoft's ADNXS Tracker, where users will command more value, the more advertisers know about a user.

---

[91] *See id.*

[92] *Id.*

[93] *Id.* at 1441.

152.     Thus, Defendant installs and uses the ADNXS Tracker—in conjunction with other trackers—to deanonymize users, sell their information to advertisers, and enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique user IDs) with comprehensive user profiles.

153.     Accordingly, Defendant is using the Tracker in conjunction with other parties to (i) deanonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Tracker and allowing the Third Party to collect as much information about Website users as possible (without consent).

154.     Thus, Defendant is unjustly enriched through its installation and use of the Tracker, which causes data to be collected by Third Party without Plaintiff's and Class Members' consent, and that enables the Third Party to sell Defendant's user inventory in an ad-buying system.   In addition, Plaintiff and Class Members lost the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

155.     Further, because Defendant installs the Tracker on Plaintiff's and Class Members' browsers, the Third Party continues to track Plaintiff and Class Members wherever they go online, thus building even more comprehensive user profiles over time that are provided to the Third Party's other clients (or further enrich Defendant here).

**B.     Defendant Uses The ADNXS Tracker For Targeted Advertising and Data Monetization**

156.     Microsoft is a technology company with software-as-a-service products, such as Microsoft Advertising.   Microsoft owns and operates the ADNXS Tracker, which it provides to website owners like Defendant for a fee.   Microsoft rebranded ADNXS to "Microsoft Invest," but the two are the same service.   As noted above, the ADNXS Tracker is a DSP.

157.    According to Microsoft, "[w]ith an integrated platform advantage and a focus on data-driven performance, [Microsoft] enables you to engage audiences on all screens and drive business results."[94]

158.    Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[95]

159.    In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus."  The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.

> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.

> …

> Once we get the call, we overlay segment data from our server-side cookie store.  Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data.  We also contact third-party data providers and overlay any available data.

> We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.

> …

> The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad.[96]

---

[94] Vanessa Lotz & Kaitlin Gandolfi, *Reach Engaged CTV Audiences with Microsoft Invest*, MICROSOFT ADVERTISING (July 10, 2024), https://tinyurl.com/2n5w5tjc.

[95] *Id.*

[96] *Id.*

1

160.    Microsoft Invest (*i.e.*, the ADNXS Tracker) provides "targeting, bidding algorithms,
2
multi-currency support, and all the other features of a premium ad server."[97]  To do this, Microsoft
3
utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft
4
Advertising segment pixels or by clients sending [them] a file of data.  [They] also contact third-
5
party data providers and overlay any available data."[98]

6

161.    As alleged above, Microsoft also syncs with trackers from ID5 and The Trade Desk
7
on Defendant's Website to enrich Defendant's user data and therefore obtain higher bids to show
8
advertisements to Defendant's users.  And Microsoft discloses all this information to advertisers that
9
bid on Defendant's users, regardless of whether the advertiser wins the bid.

10

162.    Further, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the
11
cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file
12
of data.  [They] also contact third-party data providers and overlay any available data."[99]

13

163.    In other words, when users visit Defendant's Website, Microsoft collects users' IP
14
addresses, Device Metadata, and unique user identifier (the UUID2) through its ADNXS Tracker—
15
as installed by Defendant—to provide to advertisers interested in showing an advertisement to
16
Defendant's Website users, enriching that information by integrating with data brokers like ID5, and
17
ultimately enabling Defendant to monetize its Website and maximize revenue by enabling Microsoft
18
to collect as much information about Defendant's users as possible.

19
**IV.     PLAINTIFF'S EXPERIENCE**

20

164.    Plaintiff Rodriguez visited the Website multiple times on her desktop browser during
21
the class period, including in October 2025.  The browser was set to its default settings, meaning
22
Plaintiff was unknowingly subjected to tracking practices and served targeted advertisements as a
23
result of Defendant's conduct.

24

165.    When Plaintiff visited the Website, the Website's code—as programmed by
25
Defendant—caused the ADNXS Tracker to be installed on Plaintiff's browser.  *See* Figures 4-5,

26
———————————————
[97] *Id.*
27
[98] *Id.*
28
[99] *Id.*

*supra.* Defendant also caused the Data Broker's tracker and The Trade Desk's tracker to be installed on Plaintiff's browser. *See* Figures 6-7, 13 *supra.*

166. Through its ADNXS Tracker, Microsoft collected Plaintiff's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Microsoft to pervasively track Plaintiff across multiple Website sessions and even other websites, as well as deanonymize Plaintiff by linking her to a user profile and synchronizing that profile with other entities with trackers on the Website like ID5 and The Trade Desk. *See* Figures 4-7, 13, *supra.*

167. Defendant and Microsoft used the information collected by the Tracker to:

- identity Plaintiff and either create a new profile of her or match Plaintiff to a pre-existing profile (either in Microsoft's own database or with another entity's profile, such as the ID5 or The Trade Desk)

- sell Plaintiff's information to advertisers for hyper-targeted advertising based on the information collected by Microsoft on the Website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Microsoft on the Website)

- target Plaintiff with advertisements and serve advertisements on Plaintiff based on the information collected by the Third Party on the Website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Microsoft on the Website)

- deanonymize Plaintiff and generate revenue from the sale of Plaintiff's information—both what is collected on the Website by Microsoft and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Microsoft's revenue and the value of the Third Party's services.

168. Plaintiff did not provide her prior consent to Defendant to install or use the Tracker on her browser. Nor did Defendant obtain a court order before installing or using the Tracker.

169. Thus, Plaintiff has had her privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Party's surreptitious and unconsented-to collection of Plaintiff's data.

170.    Accordingly, Plaintiff has been injured by Defendant's violation of the CIPA.

## CLASS ALLEGATIONS

171.    Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP addresses collected by the Tracker (the "Class").

172.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

173.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of people.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

174.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)    Whether Defendant violated CIPA section 638.51(a);

(b)    Whether the ADNXS Tracker is a "pen register" pursuant to Cal. Penal Code § 638.50(b);

(c)     Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(d)     Whether Defendant sought or obtained a court order for its use of the Tracker; and

(e)     Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the violations.

175.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had her IP address collected by the Tracker, which was installed and used by Defendant.

176.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel who are experienced in prosecuting class actions, and she intends to prosecute this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

177.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

178.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

179.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

180.     CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

181.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

182.     The ADNXS Tracker is a "pen register" because it is a "device or process" that recorded or decoded the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiff's and Class Members' computers or smartphones. Cal. Penal Code § 638.50(b); *see also Lesh*, 767 F. Supp. 3d at 40-42.

183.     Likewise, the Tracker is a "pen register" because it is a "device or process" that is being used to ascertain the identity of visitors to Defendant's Website and is thus capturing "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

184.     At all relevant times, Defendant installed the Tracker—which is a pen register—on Plaintiff's and Class Members' browsers, which allowed the Third Party to record or decode Plaintiff's and Class Members' IP addresses and Device Metadata. The Tracker also set a unique user identifier on Plaintiff's and Class Members' browsers so Microsoft could deanonymize Plaintiff and Class Members and track them across multiple Website sessions and multiple websites.

185.    Defendant and Microsoft used the information collected by the Tracker to:

(a)    identity Plaintiff and Class Members and either create new profiles of them in Microsoft's database or match Plaintiff and Class Members to pre-existing profiles (either in Microsoft's own database or with another entity's profile);

(b)    sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by Microsoft on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by Microsoft on the Website);

(c)    actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by Microsoft on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by Microsoft on the Website); and

(d)    deanonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by Microsoft and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and Microsoft's revenue and the value of Microsoft's services.

186.    The ADNXS Tracker does not collect the contents of Plaintiff's and Class Members' electronic communications with the Website.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3; *Fregosa*, 2025 WL 2886399, at *5.

187.    Plaintiff and Class Members did not provide their prior consent for Defendant's installation or use of the Tracker.  Nor did Defendant obtain a court order to install or use the Tracker.

188.    Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)  For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)  For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)  For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)  For pre- and post-judgment interest on all amounts awarded;

(f)  For an order of restitution and all other forms of equitable monetary relief; and

(g)  For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: November 14, 2025            Respectfully submitted,

**BURSOR & FISHER, P.A**.

By:    */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
      klynn@bursor.com
      jwilner@bursor.com

*Attorneys for Plaintiff*